**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael A. KELLY, Defendant-Appellant.**

No. 76–2782.

United States Court of Appeals,
Fifth Circuit.

July 20, 1977.

Rehearing Denied Aug. 22, 1977.

James T. Allen, El Paso, Tex. (Court-appointed), for defendant-appellant.

John E. Clark, U. S. Atty., Leroy M. Jahn, Ronald P. Guyer, John M. Pinckney, III, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before AINSWORTH and MORGAN, Circuit Judges, and LYNNE, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

Michael Anthony Kelly, a former Customs Patrol Officer, appeals his conviction on a two count federal indictment that grew out of his part in the warrantless break-in and attempted "bugging" of a suspected drug smuggler's home. We affirm.

## I. FACTS AND PROCEEDINGS BELOW.

One night in early January of 1975, three Customs Patrol Officers of the United States Customs Service, Kelly, Wade, and Hough, and an informant, Kirkendall, set out to break into the El Paso, Texas home of a suspected drug smuggler. Their object was to hide a small radio transmitter there. Their purpose, they said later, was to obtain advance information about this person's movements. They made no attempt to obtain a warrant, as required by the Fourth Amendment, or the approval of the Attorney General of the United States, as required by 18 U.S.C. § 2516(1). Kelly, an electronics expert, had constructed the transmitter from a sensor device of a kind ordinarily planted near the United States-Mexico border to monitor unauthorized border crossings.

* Senior District Judge of the Northern District of Alabama, sitting by designation.

The four men drove to the street where the subject's home was located. Wade went to the house and knocked on the door to make sure no one was inside. When he returned, Kirkendall went to the house, broke in, and looked for somewhere to hide the transmitter. Kelly, Wade, and Hough remained outside, keeping a lookout for the home's occupant and for El Paso police. After a time Kirkendall returned, having failed to find a suitable place to hide the transmitter. He brought with him a radio monitor and some papers that he had taken from the house. The four men left.

In May of 1975 another informant, identified in the proceedings below by the pseudonym "Mr. Smith," made allegations to Internal Affairs agents of the Customs Service concerning a number of instances of wrongdoing by Customs Patrol Officers. Internal Affairs began an investigation which brought to light the break-in described above, among other things. Kelly was questioned by Internal Affairs agents in the office of the district director of the Customs Patrol in El Paso on June 10, 1975; by Internal Affairs agents, Drug Enforcement Administration personnel, and Assistant United States Attorney Ederer in Ederer's office in the El Paso federal courthouse on June 11, 1975; and by Internal Affairs agents Kyle and Reimann at a motel in El Paso on August 24, 1975. On all three occasions Kelly was given his *Miranda* rights, waived them, and discussed his involvement in the break-in. These statements were recorded and later transcribed.

Kelly also appeared before a federal grand jury in El Paso on August 14, 1975.

On March 10, 1976 the federal grand jury in El Paso returned a two count indictment against Kelly, Wade, and Kirkendall, charging that they had willfully endeavored to use an electronic device to intercept and transmit oral communications in violation of 18 U.S.C. § 2511(1)(b) [1] and that they had conspired to do so in violation of 18 U.S.C. § 371. [2] Hough was named as an unindicted co-conspirator. [3]

Kelly filed pretrial motions requesting that Judge Sessions recuse himself from presiding over the case, that Kelly's August 24, 1975 statement to Kyle and Reimann be suppressed, and that the indictment be dismissed on the ground of selective prosecution. All three motions were denied, the latter two after an evidentiary hearing.

Before the case went to trial, Kirkendall pleaded guilty to a reduced charge of willfully under color of law depriving an inhabitant of a state of rights secured by the Constitution in violation of 18 U.S.C. § 242. He was sentenced to one year of probation. Kelly and Wade went to trial on June 7, 1976. During the course of trial, the case against Wade was dismissed because it was based on a statement by him taken under an implied grant of use immunity. The case against Kelly continued.

The government read portions of Kelly's June 10, June 11, and August 24 statements to the jury during its case in chief. At the close of the government's evidence, the dis-

---

1. 18 U.S.C. § 2511 provides:
   (1) Except as otherwise specifically provided in this chapter any person who—

   .    .    .    .    .

   (b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

   .    .    .    .    .

   (ii) such device transmits communications by radio  .  .  .
   shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 371 provides:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or

any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. Hough had been arrested on June 8, 1975 and charged with smuggling eleven pounds of cocaine into this country while a Customs Patrol Officer, an incident in which the others were not involved. He was convicted on this charge and sentenced to twelve years in prison and an additional twelve years on special parole. He was not indicted on the eavesdropping charge in return for his cooperation in developing that case.

trict court denied Kelly's motion to direct a verdict of acquittal. Kelly then testified on his own behalf and presented other evidence. He did not renew his motion for acquittal at the close of all the evidence.

The thrust of Kelly's defense was that he thought his actions were lawful because he thought his Customs Service superiors had approved those actions. Neither Kelly, nor Hough, nor Wade, nor Kirkendall testified that any supervisor ever had given them express prior approval to carry out the operation. As we shall detail at greater length later, Kelly and Wade testified that they nonetheless had thought their superiors knew about the operation before it took place. This testimony was impeached by prior inconsistent statements of both men. Hough and Kirkendall testified that their superiors had not known about the operation in advance.

The jury was instructed that specific intent was an element of the offenses charged and that, "evidence that the accused acted or failed to act because of ignorance of the law is to be considered by the jury in determining whether or not the accused, Mr. Kelly, acted or failed to act with the specific intent as charged." The jury found Kelly guilty on both counts of the indictment. The district court sentenced Kelly to the custody of the Attorney General for two consecutive two year terms, suspended the sentence, and placed Kelly on five years' unsupervised probation on each count.

Kelly appeals, assigning four grounds of error. First, he argues that the district court erred in denying his motion to suppress his August 24, 1975 statement because that statement was not shown to have been made voluntarily. Second, he argues that Judge Sessions erred in declining to recuse himself because the judge was the United States Attorney for the district in which the indictment was brought at the time the allegedly unlawful acts were committed. Third, he argues that the district court erred in denying his motion to dismiss the indictment on the ground of selective prosecution and in unduly limiting the scope of evidence that he was allowed to present in support of this ground. Finally, he argues that the district court erred in refusing to direct a verdict of acquittal, based on his supposed good-faith belief that his acts were not unlawful and that his Customs Service superiors had approved the break-in and attempted bugging. For the reasons that follow, we find all four grounds to be without merit.

## II. MOTION TO SUPPRESS THE AUGUST 24, 1975 STATEMENT.

▉ Kelly moved to suppress the statement that he made to Customs Service Special Agents Kyle and Reimann on August 24, 1975 on the ground that the statement was not made voluntarily. The district court held the required evidentiary hearing, *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and denied the motion. Our review of this ruling is limited to determining whether the district court's finding that the statement was made voluntarily was clearly erroneous. *United States v. Vasquez*, 534 F.2d 1142, 1146 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976). We hold the finding was not clearly erroneous.

Kelly quit his job with the Customs Service in June of 1975, shortly after the case began to surface, and went to New York. In August of that year, Special Agent Maloof of the Office of Internal Affairs of the Customs Service, who was supervising the investigation, telephoned Kelly in New York and asked whether Kelly would return to El Paso to give a statement to other Internal Affairs agents. At the suppression hearing, Kelly testified that Maloof had told him not to bother to make the trip if he intended to invoke his Fifth Amendment privilege. Record Vol. 3 at 358–59.

Kelly flew to El Paso on the evening of August 24. Agents Kyle and Reimann met him at the airport and drove him to a motel where a room had been reserved for him. Kelly got to the motel between 9 and 10 p. m. and spoke briefly with Maloof. From this point on, Maloof's Kyle's, and Reimann's accounts differ from Kelly's.

Maloof testified that when Kelly arrived at the motel, he asked Kelly how he felt and whether he was tired from the trip. Maloof stated that Kelly said he was not tired, that he would prefer to give the interview that night, and that he had a toothache. When Maloof suggested that they postpone the interview until the next day, he said, Kelly repeated that he wanted to do it that night. Record Vol. 3 at 202. Reimann also testified that Kelly volunteered to give the interview that night rather than the next day. *Id.* at 344–45.

Maloof testified that Kelly did not appear to be intoxicated and that his speech was not slurred, his eyes were not bloodshot, and his walking was stable. Record Vol. 3 at 204. Kyle also testified that Kelly's physical condition appeared to be normal. *Id.* at 98–99.

After Kelly registered at the motel, he, Kyle, and Reimann went to the agents' room for the interview. Kyle started a tape recorder and read Kelly his *Miranda* rights, and Kelly said that he understood and would waive those rights. Record Vol. 3 at 96–98, 361, 364–65; Defendant's Exhibit 2–Ke at 2. The interview, which covered a number of topics in addition to the break-in, lasted about four hours. During that time Kelly went to his own room once to get medication for his toothache. Reimann testified that the agents brought Kelly two soft drinks during the interview and that neither Kelly nor the agents consumed any alcoholic beverages during it. *Id.* at 346–47. At the end of the interview, Kelly swore that the information he had provided was the truth, Defendant's Exhibit 2–Ke, although he later refused to sign a transcript of the statement.

Kelly's recollection of that evening differed from the agents'. He said that when he arrived in El Paso, he told the agents he was extremely tired and had a bad toothache. He said he indicated that he would prefer to postpone the interview until the next morning. He also said he had been drinking so much on the airplane that he thought it would have been obvious to the agents. Kelly testified that it was the agents, and not he, who insisted on proceeding with the interview that night rather than the next morning. He also claimed that the agents had given him two beers during the interview and that Kyle also had had one. Record Vol. 3 at 353–55, 363–64.

In addition to his testimony that he had felt pressured into giving his statement that night rather than the next day, Kelly testified that he had been pressured and lulled in other ways before that night. He stated that Maloof had said he would try to get Kelly reinstated in the Customs Service if he gave the statement, Record Vol. 3 at 352, 362, although Maloof did not corroborate that claim. He also said that at the end of his June 11 interview in Assistant United States Attorney Ederer's office, Ederer had said he saw nothing for Kelly to be concerned about, *id.* at 350–51, and that he thus had been lulled into a false belief before the August 24 interview that he would not be prosecuted for the break-in, *id.* at 357. Of two other persons who had been present during the interview in Ederer's office, only one thought he remembered Ederer making such a statement, and he thought it was in reference to a matter other than the break-in. *Id.* at 166–67, 335–36. Kelly also complains that Maloof led some supervisors involved in the investigation to believe that no one had anything to worry about, *id.* at 209, 218–20, although Kelly was not present on those occasions, *id.* at 208, 226, and no one was shown to have communicated Maloof's alleged statements to him, *id.* at 229–30. Maloof testified that he did not try to lead Kelly to believe that the investigation was anything but serious. *Id.* at 203.

On this evidence, the district court did not commit clear error in finding that Kelly's August 24 statement was made voluntarily. The district court was entitled to believe the three agents' version of what happened that night over Kelly's. It also was not required to believe Kelly's uncorroborated story that Maloof told him he would help him regain his job if he talked about the break-in. And finally, the court could have found that Kelly's claim that he

thought there was no possibility of criminal prosecution when he made the statement was not credible in light of the facts that Maloof told him before he left New York that he was entitled to assert his Fifth Amendment privilege; that Kelly had been called before the grand jury just ten days earlier; and that the agents gave Kelly full *Miranda* warnings just before the interview. We hold the district court did not err in refusing to suppress the August 24 statement.

### III. MOTION TO RECUSE.

■ 28 U.S.C. § 455(b)(3) requires a judge to disqualify himself

> [w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
>
> . . .

Judge Sessions was the United States Attorney for the Western District of Texas during at least part of December, 1974, and he became a United States District Judge for that district on December 24, 1974.

The indictment in this case charged that the unlawful acts took place, "sometime during the months of December, 1974, and January, 1975." Record Vol. 1 at 1–2. Kelly argues that Judge Sessions, by virtue of his position as United States Attorney, thus was "of counsel" for the government, *see, e. g.,* 28 U.S.C. § 547; *Barry v. United States,* 528 F.2d 1094, 1099 n.14 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *Roberson v. United States,* 249 F.2d 737, 741 (5th Cir. 1957), *cert. denied,* 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715 (1958), during part of the time in which the underlying unlawful acts were alleged to have taken place. From this, he would have us conclude that § 455 required the judge to recuse himself.[4]

The government, while conceding that a United States Attorney is "of counsel" for the government during his tenure in office, argues that a judge is disqualified under § 455 only if he was United States Attorney when the prosecution was initiated, and that he is not disqualified merely by virtue of the fact that he was United States Attorney when the offense was committed. It points out that the undisputed facts show that the United States Attorney did not even begin his investigation of the break-in until June or July of 1975, about six months after Judge Sessions left the United States Attorney's office,[5] and concludes that the judge was not disqualified.

The government marshals strong support for the position that it is the date that the prosecution was initiated, and not the date of the underlying offense, that is of critical importance in deciding whether a former United States Attorney is disqualified from presiding over a criminal case. *E. g., Barry v. United States, supra,* 528 F.2d at 1098–99; *In re Grand Jury Investigation,* 486 F.2d 1013, 1015–16 (3d Cir. 1973), *cert. denied sub nom. Testa v. United States,* 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *United States v. Wilson,* 426 F.2d 268, 269 (6th Cir. 1970); *Adams v. United States,* 302 F.2d 307, 310 (5th Cir. 1962). Kelly has called no contrary authority to our attention.

All the cases cited above, however, were decided under the predecessor statute to current § 455, which required a judge to "disqualify himself in any case in which he . . . has been of counsel . . . ." The results in those cases depended at least in part on a judgment concerning when a "case" began. *See, e. g., Barry v. United States, supra* 528 F.2d at 1098. Neither party before us addresses itself to the issue whether the 1974 amendment of § 455 was meant to change those results. We, how-

---

**4.** There is no indication, and defendant does not argue, that Judge Sessions had "expressed an opinion concerning the merits of the particular case in controversy" while he was United States Attorney. Defendant relies solely on the first clause of § 455(b)(3).

**5.** The government also so represented to the judge in its opposition to the motion to recuse. Record Vol. 1 at 42.

ever, have found no reason to believe that it was, at least in any way material to this case.

§ 455(b)(3) requires disqualification where the judge has "participated as counsel, adviser or material witness concerning the proceeding . . ." § 455(d)(1) states that for purposes of § 455, " 'proceeding' includes pretrial, trial, appellate review, or other stages of litigation." It can be argued that this definition of "proceeding" represents the equivalent of a "case" under the old § 455, and that a former United States Attorney need not recuse himself unless he still was in that position after the "proceeding" began. That is, "proceeding," like "case" in the old § 455, would be read as referring to a stage in actual litigation.

An alternative, more narrow reading would emphasize the word "participated," and hold that a former United States Attorney would not be disqualified unless he had taken some actual part in the proceeding. Another, broader alternative reading would emphasize the word "concerning," and hold that a former United States Attorney would be disqualified if he had participated in an investigation during his tenure in office that led to the institution of proceedings only after he left office.

We are not required to choose among these possible readings in this case, however, for it is plain that under any of them, Judge Sessions was not disqualified. It suffices to dispose of this case to state that we see no way to read § 455(b)(3) to support a holding that a former United States Attorney would be disqualified merely because he was in office when the offense was committed, even though it was not discovered, investigated, or prosecuted until after he left office. We hold that Judge Sessions did not err in denying the motion to recuse.

## IV. SELECTIVE PROSECUTION.

Kelly and the other defendants filed a pretrial motion to dismiss the indictment on the ground that they had been selected for prosecution on an invidiously discriminatory basis, in violation of the equal protection component of the due process clause of the Fifth Amendment. Their claim was that the Justice Department, through the United States Attorney, had decided to prosecute criminal offenses committed by Customs Service personnel while ignoring offenses committed by Drug Enforcement Administration personnel. The Customs Service is a branch of the Treasury Department, while DEA is a branch of the Justice Department. In 1973 much authority for investigating drug smuggling was transferred by Executive Order from the Customs Service to DEA. It appears that friction and a lack of cooperation between Customs and DEA resulted from this change, as did some concern in Congress. It was Kelly's theory that the Justice Department decided to prosecute Customs Service personnel, who were part of Treasury, and to protect DEA personnel, who were part of Justice, in order to give Justice an edge in the ongoing bureaucratic squabble.[6]

The district court gave Kelly an opportunity to present evidence in support of his allegations. The court was adamant, however, that Kelly would not be permitted to subpoena the United States Attorney or the Assistant United States Attorney who were handling the prosecution unless and until Kelly made what was characterized as a "prima facie" case of invidiously discriminatory prosecution. The court also was reluctant to allow evidence of acts committed outside the Western District of Texas, although some such evidence did come in. After this evidentiary hearing, at which Kelly called but a single witness, the district court denied the motion to dismiss. Kelly assigns as error both the denial of the

---

6. Kelly asserts, "[T]he Defendants herein were singled out because they worked for the United States Customs Office under the supervision of the Department of the Treasury rather than the Drug Enforcement Administration under the Department of Justice. The Department of Justice was taking care of its own and invidiously prosecuting these Customs Officials." Brief for Appellant at 5–6. And, "Appellant herein was merely a victim of a feud between the Drug Enforcement Administration and United States Customs." *Id.* at 7.

motion and the limitation on the scope of evidence.

In recent years there has been an explosion in the number of cases in which claims of invidiously selective prosecution have been made, and a number of courts have held or stated that in certain circumstances it may be necessary to dismiss a prosecution before trial because its very bringing violates the due process clause of the Fifth Amendment. *E. g., United States v. Ojala,* 544 F.2d 940, 943 (8th Cir. 1976); *United States v. Leggett & Platt, Inc.,* 542 F.2d 655, 658 (6th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *United States v. Bourque,* 541 F.2d 290, 292–93 (1st Cir. 1976); *United States v. Bennett,* 539 F.2d 45, 54 (10th Cir.), *cert. denied,* 429 U.S. 925, 50 L.Ed.2d 293 (1976); *United States v. Crow Dog,* 532 F.2d 1182, 1196 (8th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Oaks,* 527 F.2d 937, 940 (9th Cir. 1975), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *United States v. Peskin,* 527 F.2d 71, 86 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); *United States v. Scherer,* 523 F.2d 371, 377 (7th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1108, 47 L.Ed.2d 315 (1976); *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *United States v. Swanson,* 509 F.2d 1205, 1208–09 (8th Cir. 1975); *United States v. Mirabile,* 503 F.2d 1065, 1067 (8th Cir. 1974), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *In re Dellinger,* 502 F.2d 813, 817–18 (7th Cir. 1974), *cert. denied,* 95 S.Ct. 1425, 420 U.S. 990 (1975); *United States v. Berrios,* 501 F.2d 1207 (2d Cir. 1974); *United States v. Berrigan,* 482 F.2d 171, 176–82 (3d Cir. 1973); *United States v. Falk,* 479 F.2d 616 (7th Cir. 1973) (en banc); *United States v. Steele,* 461 F.2d 1148, 1150–52 (9th Cir. 1972). But the proposition that the courts have the power to dismiss an indictment because of the way in which the prosecutor exercised his discretion whether or not to prosecute has met with extreme skepticism in this court. *E. g., United Stated v. Mann,* 517 F.2d 259, 271 (5th Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *United States v. Raven,* 500 F.2d 728, 733 & n.14 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *United States v. Ream,* 491 F.2d 1243, 1246 (5th Cir. 1974); *but cf. United States v. Smith,* 523 F.2d 771, 782 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). This skepticism derives from the view, expressed in *United States v. Cox,* 342 F.2d 167, 171 (5th Cir.) (en banc), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), that, "as an incident of the constitutional separation of powers, . . . the courts are not free to interfere with the free exercise of the discretionary powers of the attorneys of the United States over criminal prosecutions."

We need not decide today, however, whether there is any room at all in the precedents of this court for a claim of the kind made by Kelly. It is plain to us that even if we were to follow the path taken by the other circuits whose cases are cited above, Kelly fell far short of establishing his claim. Almost without exception, those circuits follow the rule laid down in *United States v. Berrios, supra,* 501 F.2d at 1211:

> To support a defense of selective or disc[r]iminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

We need not go beyond the first prong of this test, for Kelly failed to show that the United States has not prosecuted DEA agents who committed offenses similar to his own.

The only witness called by Kelly on the motion to dismiss was Jack Compton, the director of the Customs Patrol in Laredo, Texas. Compton testified that on August 20, 1975 he contacted the United States Attorney and an Assistant United States Attorney for the Western District of Texas and told them of instances of wrongdoing by officers of agencies under the Justice Department. On direct examination, Compton did not say what his allegations had been, and he did not know whether the United States Attorney had investigated the allegations. As far as he knew, no indictments had resulted. Record Vol. 3 at 414–16.

On cross-examination by the government, Compton stated that the United States Attorney had, in fact, asked him for additional information concerning his allegations. He stated that many of his allegations had involved conduct taking place in Mexico, and that the United States Attorney had explained to him that he did not have jurisdiction over Mexico. Record Vol. 3 at 422, 424, 427–28. He also stated that some of his allegations concerned conduct that had taken place in 1967 and 1968, and that the United States Attorney had explained to him that the federal statute of limitations was five years. *Id.* at 423, 431. There also appear to have been other vague allegations of irregularities, none of which was clearly stated. In short, Compton gave no firm evidence that he had notified the United States Attorney of conduct that might have been prosecuted.

On redirect examination, Compton testified that other agents had accompanied him to talk to the United States Attorney in August of 1975. He said that the other agents had talked to the United States Attorney out of his presence, and the district court, not unreasonably, would not permit Compton to testify as to what was said in those meetings. Kelly chose not to call those other agents to testify.

■ On this evidence, the district court certainly could conclude that Kelly had not shown that DEA agents situated similarly to himself had escaped prosecution for acts

similar to his own. *See United States v. Scott, supra,* 521 F.2d at 1195. Kelly complains that he could have made a better case if the court had permitted him to call the United States Attorney and Assistant United States Attorney to testify. The district court quite properly was loath to permit questioning of these prosecutors about other investigations that they had conducted or were conducting or about their reasons for the manner in which they exercised their prosecutorial discretion, without some demonstration by Kelly that his complaint might have merit. We hold that the district court did not err in this respect. *See United States v. Berrigan, supra,* 482 F.2d at 180–82. We also think the district court did not err in excluding such items as newspaper clippings or transcripts of congressional hearings, for Kelly made no attempt to explain how they were relevant to his theory that the Justice Department was discriminating against Customs Service personnel and in favor of DEA personnel.

## V. DENIAL OF THE MOTION TO DIRECT A VERDICT OF ACQUITTAL.

■ Kelly, citing *United States v. Barker,* 546 F.2d 940 (D.C.Cir.1976), argues that the district court erred in denying his motion to direct a verdict of acquittal, which was based on his asserted good-faith belief that his actions were lawful because his Customs Patrol superiors had approved the break-in and bugging in advance. Kelly made his motion at the close of the government's evidence but did not renew it at the close of all the evidence. Putting aside our doubts whether this ground was properly preserved for review, *see, e. g., United States v. Perez,* 526 F.2d 859, 863–64 & ns.3, 4, & 7 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976), we find it to be without merit.

In *United States v. Barker, supra,* two of the men who broke into the office of Daniel Ellsberg's psychiatrist appealed convictions for violating 18 U.S.C. § 241. At their trial, they attempted to establish as a defense that they had harbored a reasonable belief

that E. Howard Hunt, who had recruited them for the break-in, had the legal authority to authorize it. The district court limited the evidence that defendants were permitted to present in support of this ground. 546 F.2d at 944 (opinion of Wilkey, J.). The district court also refused to give an instruction, requested by defendants, that:

> [I]f you find that a defendant believed he was acting out of a good faith reliance upon the apparent authority of another to authorize his actions, that is a defense to the charge . . . ., provided you find that such a mistake by a defendant was made honestly, sincerely, innocently and was a reasonable mistake to make based upon the facts as the defendant perceived them.

*Id.* at 949 (opinion of Wilkey, J.). Instead, the court instructed that only a mistake of fact, and not one of law, would negate the element of specific intent. Specifically, the court told the jury that, "an individual cannot escape the criminal law simply because he sincerely but incorrectly believes . . . that his superiors had the authority without a warrant to suspend the Constitutional protections of the Fourth Amendment." *Id.* at 945 n.6 (opinion of Wilkey, J.).

The court of appeals, one judge dissenting, reversed and remanded for a new trial. Judge Wilkey acknowledged the general rule that only mistakes of fact, and not of law, serve to negate criminal intent. 546 F.2d at 946–47. He went on to note certain exceptions to the mistake-of-law rule that he said derived from "an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected." *Id.* at 947. Characterizing the defendants' claim as one of mistake of law, *id.* at 948–49 & ns. 24 & 28, he stated his view that the defendants should prevail if they showed, "*both* (1) *facts* justifying their reasonable reliance on Hunt's apparent authority and (2) *a legal theory* on which to base a reasonable belief that Hunt possessed such authority." *Id.* at 949 (emphasis in original). Hence, in Judge Wilkey's opinion, the dis-

trict court erred both in its evidentiary limitations and in its instructions. Judge Merhige, concurring in the result, made a somewhat similar analysis and concluded that, "the [mistake-of-law] defense is available if, and only if, an individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field." *Id.* at 955 (opinion of Merhige, J). *See also United States v. Barker,* 168 U.S.App.D.C. 312, 514 F.2d 208, 227–37 (Bazelon, C. J., concurring); 240–44 (MacKinnon, J., dissenting); 263–70 (Wilkey, J., dissenting) (1975) (en banc); *but see United States v. Barker,* 546 F.2d 940, 961–73 (Leventhal, J., dissenting).

Without expressing an opinion on the views offered in *Barker,* we note that this case comes to us in a much different posture from that case. There, the defendants wanted only a chance to offer their theory to the jury. Here, defendant seeks a holding that a defense was established as a matter of law. There, defendants were not permitted to put all the evidence of their claim authorization before the jury. Here, no such limitation was imposed. There, the district court instructed that a mistake of law is no defense and refused defendants' requested instruction that a reasonable belief that the acts were lawfully authorized would be a defense. Here, the district court instructed—at the government's request, not the defendant's *see* Record Vol. 1 at 199—that ignorance of the law could negate specific intent; and here, defendant neither objected to this instruction nor offered any of his own on the subject.

Thus, in order to decide the case in its present posture, we need not decide whether defendant's theory—that a good-faith belief that his Customs Patrol superiors had lawfully approved the break-in in advance would be a valid defense—is correct. It is enough to demonstrate that, assuming the theory is correct,[7] the evidence on whether

7. Defendant seems to have overlooked the second prong of the test posited by Judge Wilkey in *Barker,* for he has advanced no legal

Kelly did harbor such a belief was highly equivocal. On this ground alone, we hold the district court did not err in refusing to direct a verdict. Because Kelly does not complain of the instructions that were given and did not request any other instructions, we have no occasion to express a view on the matters that so troubled the District of Columbia Circuit in the two *Barker* cases.

The government called Hough in its case in chief. He testified that the conspirators, possibly excluding Wade, had met in his apartment the day of or day before the break-in to plan it. According to him, he had not discussed the break-in with any of his supervisors. Record Vol. 4 at 160–61. Kirkendall had not told him that the supervisor Chapuis had authorized Kirkendall to take a "bug" from the Customs Patrol office. *Id.* at 204–05. Hough denied emphatically that he had told any of the other conspirators the break-in had been authorized: "There's no way to get authorization for something like that. No, I never indicated that to anybody." *Id.* at 165.

Hough testified that he had known they were breaking the law. Record Vol. 4 at 189–90. He also said that Kelly had opposed letting Kirkendall carry a two-way Customs Patrol radio into the house during the break-in, because that would link the Customs Patrol to the break-in if Kirkendall, a private citizen, were caught by the El Paso police. *Id.* at 156–57, 190. He stated that all four conspirators had worn gloves that night, apparently in order not to leave fingerprints. *Id.* at 162.

The government also called Kirkendall. He testified that no Customs Patrol personnel had authorized the break-in, Record Vol. 4 at 216–17, and that Hough had not told him or anyone in his presence that it was authorized, *id.* at 217. He said he wore gloves during the break-in. *Id.* at 220. He also stated that before the break-in, he had asked a Customs Patrol supervisor for some

unspecified electronics equipment, and that the supervisor had told Kelly, the electronics expert, to get him "whatever he needed." Kirkendall did not say he had asked for, or the supervisor had authorized, use of a bug.

The defense called Wade, who contradicted Hough by testifying that Hough had told him the break-in was authorized. Record Vol. 4 at 385, 401. He said, however, that Hough did not tell him *who* authorized it and that he never asked. *Id.* at 402. He stated that Hough had not told him the break-in was authorized in front of Kelly, *id.* at 391, that he had never heard Hough tell Kelly that, *id.* at 397–98, and that he himself had never told Kelly that, *id.* at 401. Wade's testimony was impeached by a prior statement in which he had said that Hough did not tell him the break-in was authorized and that as far as he knew, no superiors knew about it in advance. *Id.* at 392–93.

Finally, Kelly testified. He said that he had been with Kirkendall when Kirkendall asked a supervisor for some electronic equipment. Kelly said the supervisor had told him to give Kirkendall any help he needed, Record Vol. 4 at 417, but that Kirkendall had not asked the supervisor for the "specific equipment," by which he presumably meant a bug, *id.* at 416. On direct examination by his own counsel, Kelly hedged when asked whether Hough had told him he had gotten authority for the break-in and attempted bugging: "I can't remember the specific words. He indicated the office—the typical feeling was, 'Do what you have to. We'll fade the heat.' I felt the office had some type of knowledge of it, yes." *Id.* at 420. He was likewise vague when asked whether a particular supervisor had prior knowledge of the plan: "I could not say for sure. I don't know if he had any direct knowledge positively. I was under the impression that he probably knew." *Id.* The only reason he gave for

theory that would support a reasonable belief that his Customs Patrol superiors had the authority to approve the operation. *Compare* 546 F.2d at 949–54. We also note that Judge Wilkey apparently would distinguish between private citizens, like the defendants in *Barker,* and government officials, like Kelly, in deciding whether the defense was available. *See* 546 F.2d at 948–49.

this "impression" was that this supervisor had told him to help Kirkendall. *Id.* at 420–21.

Kelly's counsel also asked him if he had known his acts were unlawful when he committed them. Kelly said he had not believed they were because, "[T]he law is so vague to begin with." Record Vol. 4 at 421.

On cross-examination, the government impeached Kelly's story with a portion of his June 11, 1975 statement, where, in response to the question how far he would go in making a case, he had stated: "I wanted to make a case. If I didn't tell the supervisor how I made it within limits—I mean I wasn't going to—I'm not saying the burglary is right. There is a limit to how far." Record Vol. 4 at 439. The government also read a portion of Kelly's August 24, 1975 statement, where, as the agents followed up Kelly's response that he then knew that the use of eavesdropping equipment was unlawful, the following colloquy was had:

Q. But you went on ahead and made a bug, which is eavesdropping equipment?

A. Yes, I did.

Q. Knowing that the use of such would be illegal without approval?

A. Well, I . . . I . . . really, I knew it, you know, I wasn't really that . . .. I knew it was wrong.

*Id.* at 446–52. On all this evidence, the question whether Kelly entertained a good-faith belief that his actions had been authorized by his supervisors was sufficiently unclear that the district court plainly did not err in refusing to direct a verdict on that basis. We therefore affirm the convictions.

AFFIRMED.