Norman C. HARWELL et al.

v.

GROWTH PROGRAMS, INC., et al.

No. SA-66-CA-92.

United States District Court,
W. D. Texas,
San Antonio Division.

June 8, 1970.

Teairl W. Lewis, San Antonio, Tex., for plaintiffs.

Lionel R. Fuller, Joel H. Pullen, San Antonio, Tex., for defendants.

## MEMORANDUM OPINION

ROBERTS, District Judge.

This class action was instituted on September 16, 1966, by the named plaintiffs complaining of a simple breach of contract by Defendants Growth Programs, Inc., (Growth) Supervised Investors Inc., (Supervised) and two other defendants who were subsequently dropped by stipulation.[1] The scope of the lawsuit was expanded on December 8, 1967, when the Plaintiffs' class, which had originally been confined to residents of San Antonio, Texas, was re-defined as "all persons holding single investment programs issued by Growth Programs, Inc.", and then again in September, 1968, when the National Association of Securities Dealers (NASD) was made a party defendant. On June 30, 1969, after Plaintiffs and Defendants had filed cross-motions for summary judgment, the Securities and Exchange Commission filed an amicus curiae brief with leave of this Court. Oral argument and briefing were concluded on April 2, 1970.

The Plaintiffs were all purchasers of a 30-year single investment program sponsored by Defendant Growth for purchases of shares of Television Electronics Fund, Inc. (now known as Technology Fund, Inc.).[2] All the investment

1. Television-Electronics Fund, Inc. (now known as Technology Fund, Inc.), and the First National Bank of Jersey City.

2. Defendant Supervised is the investment manager and underwriter for the Technology Fund, Inc.

contracts involved in this litigation contained provisions whereby the investor had the right to liquidate into cash at any time and from time to time without limit, up to 90% of his shares of the underlying mutual fund (Technology Fund, Inc.), and later, at any time, could repurchase shares in his account with the cash proceeds of his prior withdrawal, at the then present value of the shares, without the payment of any additional brokerage commission. This "withdrawal and reinvestment" privilege lies at the heart of this case.

Withdrawal and reinvestment clauses similar to the one involved in this case apparently have been routinely included in investment plan contracts since the 1930's. Such clauses were originally created as a means for protecting investments in single investment programs in situations where an investor was confronted with a serious, but temporary financial emergency. Before such in-and-out provisions were inserted in investment contracts, modest investors usually could not afford to liquidate and reinvest because 50% of the total brokerage fee on a long-term contract was taken out of the first year's investment, and in order to recoup the heavy front-end sales commission, investors had to leave their money in the program uninterrupted for a number of years.

From their inception up until 1965, the withdrawal-reinvestment privileges apparently were exercised sparingly by single investment planholders. In 1965, however, Defendant Growth and some of the larger class plaintiffs devised an investment contract designed to facilitate use of the withdrawal-reinvestment privilege as a tool for speculating on short swings in the market rather than merely for conserving the underlying investment during a personal financial crisis. For this purpose, Growth "streamlined" the usual withdrawal-reinvestment clause by specifying that the privilege could be exercised an unlimited number of times, and instantly, either way, by use of the telephone or telegraph. Although the

Growth Programs Prospectus contained a statement that "this is a long term investment program, not designed for a quick profit," the Growth Program sales brochures gave prominent play to the "unlimited 'IN–AND–OUT' privileges" and stressed that the investor could withdraw 90% of the market value of his shares "at any time" and then "reinvest the same amount of cash in shares of the Fund at net asset value, without sales commission."

Between May, 1965, and mid-January, 1966, the 1,258 class plaintiffs in this lawsuit bought the Growth Programs plan with the unlimited, instant "in-and-out" privilege.

Starting in June, 1965, many of the plaintiffs began using the in-and-out privilege for speculative purposes; namely, to play short swings of the stock market by withdrawing 90% of their funds with one phone call when they believed a downturn in the market was imminent, and then reinvesting with another call at the point believed to be the bottom of the downturn. Some groups of plaintiffs even went so far as to execute powers of attorney to their brokers who in turn could then withdraw or reinvest hundreds of thousands of dollars worth of the Fund with a single phone call. Such massive withdrawals and reinvestments were often effected on the same day, taking advantage of fractional swings in the market.

By early 1966, not only Defendant NASD, but also the Securities and Exchange Commission and the Association of Mutual Fund Plan Sponsors, Inc., had become concerned over this "abuse" and "prostitution" of the traditional withdrawal-reinvestment privilege; indeed, Defendant Growth itself made efforts to restrict the use of the privilege for speculative purposes by purchasers of its investment contracts after January 17, 1966, at which time Growth added a sticker to its prospectuses advising purchasers that Growth reserved the right to limit the exercise of the in-and-out privilege to four times per year.

Both the NASD and the SEC decided that this speculative activity, which often involved turn overs of millions of dollars a month in the Growth Programs contracts alone, was harmful to the interests of both the "innocent" (non-speculating) shareholders in the underlying mutual funds, since it "diluted" their shares, and to the mutual funds themselves. On July 22, 1966, Defendant NASD, after extensive consultation with and the express approval of the Securities Exchange Commission, issued the "Interpretation with Respect to Contractual Plan Withdrawal and Reinstatement Privileges" which precipitated this lawsuit. The effect of the interpretation was to declare shortswing speculation in single investment programs to be not in the public interest, and to make it impossible for an NASD-member securities dealer to offer a long-term single investment program in which the withdrawal and reinvestment provision could be used for speculative purposes.

Since Growth Programs is a member of Defendant NASD, and is bound by its rules and regulations, Growth reluctantly, and after a wait-and-see delay of over one year, complied with the NASD interpretation and thereby violated its contracts with the Plaintiffs.

Plaintiffs seek a declaration that their contracts are valid and ask this Court for a decree granting them specific performance of the contracts and enjoining Defendants Growth and Supervised from further breach of the contracts; Plaintiffs also ask for actual and exemplary damages for Defendant NASD's unlawful interference with the performance of the contracts and request an injunction forbidding enforcement of the interpretation as it applies to them. In addition, Plaintiffs seek treble damages from all the Defendants for a conspiracy in violation of the anti-trust laws. Finally, Plaintiffs pray for Court costs and attorney's fees.

Both Plaintiffs and all Defendants have filed cross-motions for summary judgment on the facts as set out above.

## I.

Throughout the long course of this lawsuit the Plaintiffs have invited this Court to take an extremely narrow view of the issues to be decided in this case: their contracts have been breached—a fact that no Defendant denies—and since they have no adequate remedy at law (the damages are too speculative) they are entitled to specific performance and injunctions against all the Defendants. As even the most casual reader of the facts underlying the suit can tell, however, this is not simply a garden variety breach of contract suit and the Defendants have refused to so treat it. Defendants have stressed the proposition that this case cannot be considered in a vacuum, and that the path to a correct decision is lined with deep-rooted public policy considerations set out by Congress primarily in the Maloney Act. Plaintiffs counter that while "the history and economics of the Securities Industry in the United States" might make for "beneficial reading in a university course," the history and the policy behind the securities regulations "are merely academic, redundant, and have no bearing upon, nor are they germane to any issue before the Court."

To the extent that the Plaintiffs do recognize existence of large public policy issues involved in this lawsuit, they urge this Court to resolve these issues by resorting to "bedrock fundamentals," and in particular, to one such fundamental; namely that "substantive vested property rights" cannot be abridged, "not even [by] the Congress of the United States, much less [the] SEC or [the] NASD * * * *" For the reasons set out below, we must reject the Plaintiffs' arguments and grant Defendants' motions for summary judgment.

## II.

Plaintiffs have argued that Defendant NASD is just an ordinary non-profit corporation, incorporated under the laws of Delaware. We do not agree. Section 15A of the Securities Exchange Act of

1934, (the Maloney Act of 1938), 15 U. S.C. § 78o–3(a)–(n) (1964) was passed in order to establish "a mechanism of regulation among over-the-counter brokers and dealers * * * to prevent acts and practices inconsistent with just and equitable principles of trade * * *." The Act authorizes the creation of one or more "national securities associations" to be registered with the Securities Exchange Commission. 15 U.S.C. § 78o–3(a) (1964); L. Loss, Securities Regulation 1361 (2d ed. 1961).

Before an association may be so registered, it must satisfy the Commission that it has met a number of standards set out in the Act. See generally 15 U. S.C. § 78o–3(b) (1964). For example, the association must have rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade * * * and, in general, to protect investors and the public interest, and to remove impediments to and perfect the mechanism of a free and open market * * *." 15 U.S.C. § 78o–3(b) (8) (1964). Moreover, the rules of the association must provide "that its members and persons associated with its members shall be appropriately disciplined by expulsion, suspension, fine, censure, or being suspended or barred from being associated with all members, or any other fitting penalty, for any violation of its rules." 15 U.S.C. § 78o–3(b) (9) (1964).

After an association has been registered with the Commission, the Act gives the Commission broad powers of review over virtually every phase of the association's activity. The Commission can veto the promulgation of any new rule or amendment to an old rule proposed by the association if the Commission finds the proposed rule inconsistent with the Act, 15 U.S.C. § 78o–3(j) (1964); moreover, the Commission has the power to abrogate any association rule if it finds that abolishing the rule would effectuate the purposes of the Act, 15 U.S.C. § 78o–3(k) (1) (1964);

and indeed, with respect to some matters, the Commission can effectively command the association to adopt a specific rule, 15 U.S.C. § 78o–3(k) (2) (1964). Finally, the Commission has plenary review powers over any disciplinary action taken by the association. 15 U.S.C. § 78o–3(g) (h) (1964).

■ Far from being just an ordinary corporation, The National Association of Securities Dealers, although organized as a Delaware non-profit corporation, is the only "national securities association" registered under the Maloney Act: it is thus effectively a Congressionally-created regulatory organization governing conduct in the over-the-counter securities market.

■ The Court has difficulty understanding Plaintiffs' unsupported contention that "even a regulatory body is without power or authority to determine public policy." It is of course hornbook law that Congress can—and often does—permissibly delegate "public policy determination" to an administrative agency. It is quite clear that the Maloney Act empowered the NASD to act—subject to pervasive supervision by the SEC—as a quasi-governmental agency charged with the responsibility of promoting, and enforcing, "just and equitable principles of trade" in the over-the-counter markets. This Congressional delegation of policy-making power to the NASD has been upheld in both R. H. Johnson & Co. v. S.E.C., 198 F.2d 690 (2nd Cir. 1952), cert. denied 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952) and in Nassau Securities Service v. S.E. C., 348 F.2d 133 (2nd Cir. 1965).

■ Similarly, the Court is mystified by Plaintiffs' unsupported claims that the NASD "is no more than a disciplinary handmaiden to SEC;" (ironically, by making this argument Plaintiffs implicitly recognize that the NASD is a quasi-governmental agency) and that "under the Maloney Act, which is the only law giving it any authority, NASD has only the power to discipline its membership." These assertions are de-

monstrably incorrect. See, e. g., 15 U.S.C. § 78o–3(j) (1964), which clearly contemplates rule-making activity on the part of a national securities association.

■ While it may be true that greater attention to detail has been paid in the Act to procedural regularity in the NASD's performance of its adjudicatory functions, it does not therefore follow that issuance of an "interpretation" is not a legitimate exercise of the NASD's rule-making authority. The NASD's by-laws clearly legitimize "interpretation" as one form of rule-making, and SEC has on numerous occasions treated the NASD interpretations as rules for purposes of exercising its statutory power of review over NASD "rules". 15 U.S.C. § 78o–3(k) (1); see e. g., National Association of Securities Dealers, Inc., 17 S.E.C. 459 (1944) where the SEC upheld the NASD's "5 per cent mark-up policy," which was announced at least in part in an "interpretation" of the very NASD Rule of Fair Practice involved in this case. See also Handley Investment Co. v. SEC, 354 F.2d 64 (10th Cir. 1965).

■ Plaintiffs' further contention that the NASD's decision to interpret the old fair practice rule rather than to attack the abuse of the in-and-out privilege on a case-by-case, disciplinary proceeding basis was a violation of due process of law is also clearly without merit. See, e. g., Columbia Broadcasting System v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

### III.

In 1939, the SEC officially approved all of the NASD's Rules of Fair Practice. 5 SEC 627 (1939). Section I of Article III of those rules provides that "A member [of NASD], in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." It was this general standard of conduct that was interpreted by the NASD on July 22, 1966, in such a way as to "stop mis-

use of the withdrawal and reinstatement privilege extended to investors under certain methods of acquiring mutual fund shares." This interpretation, by its terms, applied to all investment plans, "regardless of when the plans involved were originally opened."

Plaintiffs have mounted a three-pronged attack on the interpretation. They argue that (1) the promulgation of the interpretation without a full-blown rulemaking hearing was a violation of due process of law; (2) the promulgation of the interpretation was unwise, and has no basis in fact; and (3) the retroactive application of the interpretation is a violation of due process of law.

There is no doubt that the procedures followed by the NASD in promulgating its interpretations leave a great deal to be desired, certainly when compared to the rule-making regimen set out in section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1964). In this case, for example, no notice or chance for comment was given the NASD membership before the "legislative" rule in question here was handed down. Plaintiffs, however, have not pitched their complaints in terms of the process due to them under the APA—perhaps because they concluded that they could not, 5 U.S.C. § 551(1) (E) (1964)—but rather in terms of that process due them under the Constitution.

■ We hold there is no constitutional infirmity in the interpretation proceedings to date. Indeed, it seems curious that Plaintiffs should complain to this Court that they have been denied due process when the truth of the matter is they have willfully bypassed the bulk of the "process" made available to them by the Maloney Act itself. For 15 U.S.C. § 78o–3(k) (1) clearly contemplates extensive SEC review of any rule—or interpretation, see, e. g., 17 SEC 459 (1944)—promulgated by the NASD: the Commission, "after appropriate notice and opportunity for hearing," can "abrogate any rule" if "such abrogation is necessary or appropriate to assure fair dealing by the members of  *   *   *

[NASD] * * *." Plaintiffs suggest no reason why they have not resorted to this expedient in this case.

■ While as a general rule, this Court would deny Plaintiffs any consideration until their administrative remedies had been exhausted, there are several extenuating circumstances in this case that make that course of action unnecessary. In the first place, Plaintiffs seemingly do not have administrative review as of right in cases involving NASD rulemaking activity—unlike NASD disciplinary action, see 15 U.S.C. 778*o*–3(g) & (h) 1964—and thus it is not at all clear that treating this interpretation as final for purposes of review will disrupt a clearly established administrative scheme. Moreover, since a far narrower scope of review can be accorded the challenged rule by this Court than could be by the SEC in an abrogation proceeding, it is highly unlikely that many Plaintiffs will choose to ignore the chance of having an SEC hearing like these Plaintiffs apparently have.

Perhaps more importantly, the rationale for requiring exhaustion is very weak in this case since the SEC, the expert agency charged with supervising the NASD, has specifically approved adoption of the questioned rule in a meeting of the Commission itself, and has reiterated that approval both in an official report to Congress, Committee on Interstate and Foreign Commerce, Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 26–27 (1966), and in an amicus brief filed with this Court. This Court has certainly not been deprived of "the benefit of the expertise of the federal agency which is primarily concerned with these problems." Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L. Ed.2d 442 (1970).[3]

■ On the basis of the voluminous record in this proceeding, we hold that the NASD interpretation questioned by the Plaintiffs is clearly within the power granted the NASD by the Maloney Act; that it was issued pursuant to proper procedure; and that it is reasonable. That is all this Court need decide.

■ The Plaintiffs' final and most strenuously urged attack on the interpretation is that its retroactive application abridges their "substantive vested property rights." This Court had thought the power of "substantive vested property rights" as a talisman before which all other societal interests must fall had been put to rest over sixty years ago when, in response to just such an assertion, Justice Holmes made his famous remark that

> All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the State.

Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908). It seems quite clear that the extremely important public policy behind responsible self-regulation in the over-the-counter securities market amply justifies the retroactive application of the interpretation in this case. It is important to note in this connection, that the interpretation did not destroy Plaintiffs' withdrawal and reinvestment privileges; it simply denied Plaintiffs the use of the privilege for speculative purposes. Of course, the NASD's power and duty to administer its Rules of Fair

---

3. The Court cannot agree with the NASD's suggestion that the "exhaustion" and "primary jurisdiction" doctrines are so deeply rooted in American jurisprudence that they conspire to deprive this Court of jurisdiction in this case, even though the Plaintiffs have failed to exhaust the administrative remedy potentially available to them. See Rosado v. Wyman, 397 U.S. 397, 405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

Practice were part of the Plaintiffs investment contracts by operation of law. Plaintiffs surely remember that "contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the Government, and that no obligation of a contract 'can extend to the defeat' of that authority." Norman v. Baltimore & Ohio R. R. Co., 294 U.S. 240, 305, 55 S.Ct. 407, 414, 79 L.Ed. 885 (1935) (Opinion of Justice Hughes in one of the "Gold Clause" cases). As the SEC's "handmaiden", as Plaintiffs put it, and especially since the SEC was so deeply involved in the formulation of the interpretation, we hold that NASD's rulemaking action in this case must be considered a "valid exercise of the rightful authority of the Government;" Plaintiffs will not be heard to complain of NASD's "tortious interference with contract" arising from this quasi-governmental organization's attempt to protect the public from the predatory practices of the Plaintiffs.

### IV.

■ Both Defendants Growth Programs, Inc. and Supervised Investors, Inc. are members of the NASD.[4] As such they are bound by contract with the NASD to abide by all rules, regulations, orders, and interpretations issued to them by the Association. Failure to abide by these directives could, and indeed, according to the Maloney Act, must result in "appropriate discipline" being administered to them by the NASD. 15 U.S.C. § 78o–3(b) (9) (1964). It is obvious—indeed the Plaintiffs seem to concede—that Defendants Growth and Supervised cannot be held liable for breaching their contracts with Plaintiffs because they were ordered to do so by the NASD. To hold otherwise would seriously disrupt the statutory scheme of self-regulation established by the Maloney Act.[5]

### V.

■ Plaintiffs' claims that the NASD and its members (including Defendants Growth and Supervised, and a number of the Plaintiffs themselves) violated the antitrust laws, are vague and unsupported. Presumably they base their claim on a concerted refusal to deal theory similar to that in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). This Court agrees with the Defendants, however, that when, as in this case, the NASD is acting in the quasi-governmental rulemaking capacity given to it by the Maloney Act, and is acting under the close supervision of the SEC, it is immune from antitrust suits. This holding seems entirely consistent with the *Silver* case. Indeed, this holding may be compelled by 15 U.S.C. § 78o–3(n) (1964), which provides that if any provision of the Maloney Act—including, presumably, the provisions involved in this case authorizing the NASD to promulgate rules designed to "promote just and equitable principles of trade"—is "in conflict with any provision of any law of the United States in force on June 25, 1938, the provision of this section shall prevail." This is precisely the interpretation given this section by the

---

4. Although in the view we take of the case, the question raised about the relationship between Defendants Growth and Supervised is not particularly important, we do expressly decide that Growth is merely the alter ego of Supervised, and is simply a "tool or business conduit" through which Supervised markets single investment programs like the ones involved in this lawsuit. Thus for purposes of the future of this litigation, if Growth is ultimately held liable, Supervised should be, too.

5. By allowing Growth and Supervised the defense of "hiding behind the skirts of NASD," as the Plaintiffs put it, we in no way mean to condone their actions in this affair; it seems clear that, at least initially, they encouraged the abuse of the "in-and-out" privilege by the Plaintiffs. It seems equally clear, however, that granting specific performance of the Plaintiffs' contracts, which would punish only the investing public at large, would not be an appropriate remedy for the Defendants' overreaching, if any there was.

Supreme Court in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 227, 60 S.Ct. 811, 84 L.Ed. 1129 n. 60 (1940) (Douglas, J., in dictum). Plaintiffs antitrust claims are accordingly found to be without merit.

### VI.

There can be no doubt in this case that Section 2(e) of the Plaintiffs' contracts have been breached: Plaintiffs can no longer go "in-and-out" "at any time," as their contracts provide, and as a result, the value of their in-and-out clauses as speculative devices has been destroyed. Plaintiffs have urged this Court to end its analysis there and give them summary judgment. This Court, however, cannot ignore the fact that the reason the contracts were breached was that Defendants Growth and Supervised were following a proper directive of the NASD, the quasi-governmental organization created by the Maloney Act to regulate activity in the over-the-counter securities markets. And, although it is true that many of the class plaintiffs in his suit are not members of the NASD,

> The * * * [NASD's] enforcement of [its] rules inevitably affects the non-member involved, often (as here) far more seriously than it affects the members in question. The sweeping of the nonmembers into the currents of the * * * [NASD's] process of self-regulation is therefore unavoidable.

*Silver, supra,* 373 U.S. at 356, 83 S.Ct. at 1256 (Justice Goldberg's remarks with respect to the NYSE in this regard are equally applicable to the NASD).

In the final analysis, this Court's answer to the Plaintiffs in this lawsuit must be similar to the comment made by the 10th Circuit panel in Associated Securities Corp. v. Securities & Exchange Commission, 283 F.2d 773, 775 (10th Cir. 1960); namely, that

> In the balancing of injury to * * * [the plaintiffs in this case] and of harm to the public by the proscribed activities in securities transactions

the necessity of protection to the public far outweighs any personal detriment resulting from the impact of applicable laws.

Plaintiffs' Motion for Summary Judgment is Denied; Defendants' Motions for Summary Judgment are Granted. This Memorandum Opinion shall constitute this Court's findings of fact and conclusions of law for purposes of Rule 56, Fed.Rules Civ.Proc.