## UNITED STATES of America

v.

## Yiddy BLOOM and Jerold Bloom et al.

Crim. No. 77–383.

United States District Court,
E. D. Pennsylvania.

Jan. 26, 1978.

Albert J. Wicks, Robert E. Madden, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

E. David Rosen, Rosen & Rosen, Miami, Fla., for Yiddy Bloom.

Burton Finkelstein and John McCarthy, Finkelstein, Thompson & Levenson, Washington, D.C., for Jerold Bloom.

Alan J. Davis, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Dubbin.

James Schwartzman, Philadelphia, Pa., for DeLoge.

Bernard Hellring, Richard K. Coplon and Richard Shapiro, Hellring, Lindeman & Siegal, Newark, N.J., for Rekoon.

Donald Bowman, Gold, Bowman & Unterberger, Philadelphia, Pa., for Freeman and Knoth.

Carmen C. Nasuti, Nasuti, Miller & Fioravanti, Philadelphia, Pa., for Silbiger.

Thomas A. Bergstrom, Philadelphia, Pa., for Salaman.

Walter M. Phillips, Philadelphia, Pa., for London.

Arthur Makadon, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Ingerman.

J. Shane Creamer, Philadelphia, Pa., for Cronin.

Thomas Carroll, Philadelphia, Pa., for Street.

## MEMORANDUM

NEWCOMER, District Judge.

The Court has before it a number of motions to suppress or dismiss this indictment of stock manipulation and mail fraud. Defendants Bernard Cronin and Robert Street have moved to suppress evidence and its fruits which was seized by their brokerage firm employer. Also, they wish to have testimony given by them to the Securities and Exchange Commission suppressed or

the indictment dismissed due to government misconduct. Defendant Abraham Salaman has moved to suppress, and to dismiss the indictment, claiming that his statements to the SEC were "coerced" since they were made in an attempt to achieve a civil settlement. Furthermore, Salaman claims that he also was granted an informal or implied immunity. Defendants Myron Freeman and Jack Silbiger have moved to suppress their testimony before the SEC on the grounds that they did not receive appointed counsel to advise them during those civil sessions.

The Court has held hearings on most of these matters in open court. The evidence presented at those hearings, together with transcripts and affidavits submitted by counsel, have all been considered in arriving upon the Court's ruling. After examining the briefs and hearing oral argument, the Court has decided to deny the pending motions. The Court has included its findings of facts and conclusions of law in narrative form below.

*Search and Seizure*

Defendants Cronin and Street were employees in the Washington office of Hornblower and Weeks, Hemphill-Noyes, Inc. in 1972. Because of customers' complaints, it came to the firm's attention that the two might be involved in some serious wrongdoing, including unauthorized purchases. In November of 1972 they were terminated and were not allowed to clear their desks out. After they left the office, a Hornblower supervisor searched their desks and confiscated what evidence might be pertinent to the allegations. At the time of termination, Hornblower notified the National Association of Securities Dealers (NASD), as it did for all such actions. In January, 1973, the NASD notified Hornblower that it was beginning an investigation into Cronin and Street because of the terminations. Sometime in February or March of 1973, the NASD requested that Hornblower provide it with any relevant information in Hornblower's possession. Hornblower turned over its file to the NASD, including copies of the items removed from the desks. In June of 1973, the SEC requested information from the NASD and was given the copies of the products of the Hornblower desk search.

■ Cronin and Street now claim that the Hornblower search violated their Fourth Amendment rights, in that it was "government motivated" and done in pursuance of governmental and quasi-governmental regulations. Also, they argue that stolen evidence should be suppressed as improper. Evidence must be excluded if it is seized in connection with the activities of government agents, but the Fourth Amendment protections do not extend to searches by private parties. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1920); *United States v. Goldberg*, 330 F.2d 30 (3d Cir. 1964), *cert. den.* 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). *Goldberg* held that where business associates of the defendant took his records and turned them over to the police without his knowledge, the evidence was admissible. Most courts allow evidence stolen by private citizens to be admitted, *Philadelphia Resistance v. Mitchell*, 58 F.R.D. 139 (E.D.Pa.1972); *Arrington v. United States*, 350 F.Supp. 710 (E.D.Pa.1972). It is of no consequence therefore that Cronin and Street did not consent to the search.

■ However, any evidence taken by individuals must be free of any implication of government complicity in its acquisition. The timing of the search by a private citizen is critical in determining whether the government was motivating the search. If the government is already involved in the investigation and has contacted the private individual, some government encouragement may be presumed, unless there are facts rebutting this. In *United States v. Stein*, 322 F.Supp. 346 (N.D.Ill.1971), the court suppressed evidence obtained by a private person who feared his own possible indictment. The court found that the evidence was produced on a number of occasions during the process of interrogation sessions with the individual. The court there felt that he perceived that he was

under pressure to seize evidence on behalf of the government or face his own indictment. Where the evidence was produced because of governmental encouragement, even if subtle, "it cannot be said that the government was totally divorced from the situation under which [he] came into possession of these records." 322 F.Supp. at 348. However, in *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1974), evidence of Medicare fraud was obtained by a nurse employee, who sent copies to Blue Shield for many months before the matter was investigated by the FBI. The court had no problems in admitting all evidence she obtained prior to her contact with the FBI in January. At that time, the FBI agents told her to stop copying the evidence, but she persisted without the agency's knowledge. The court there admitted all the post-January evidence as well, finding that there was no government knowledge, actual or implicit, involved in the continued searches, since the agents had encouraged her not to obtain the evidence on her own.

 In the instant case, Hornblower acted on its own information to search for evidence of wrong-doing in 1971, prior to the 1972 investigations by the NASD and SEC. It is admitted that there was no contact with outside agencies prior to the search and seizure. There is no way that the defendants can argue that any government agent tacitly or implicitly encouraged this search. Since the search was made by a private individual and voluntarily turned over to other authorities,[1] it is no different than *Goldberg*. Being devoid of any government agent's actions, the evidence thus obtained is admissible.

However, Cronin and Street argue that the requirements for self-policing imposed both by the NASD and SEC transformed

Hornblower's search into one by the government. After studying the law, the Court concludes that this is in error. In *United States v. Burton*, 341 F.Supp. 302 (W.D.Mo.1972), the defendant claimed that searches by airline employees for weapons were "government action" because they were prompted by statutes and FAA regulations banning guns from interstate flights. He argued that the airlines' searches were made to comply with the law, and therefore were "caused" by the government so as to trigger constitutional protections. At that time, there were no FAA regulations specifically requiring airlines to search customers and their baggage. The defendant's bag was searched after a ticket agent became suspicious due to its unusual weight. The court concluded that, in light of the recent hijackings and bombings, the ticket agent's search was serving the purposes of his employer and not the government. This circuit's appellate court extended this even farther in *United States v. Valen*, 479 F.2d 467 (3d Cir. 1973). In that case, an airline employee who had in the past been paid by narcotics agents for finding contraband in air freight, reported his suspicions regarding a particular suitcase to a federal agent. In fact, the airline employee had already opened it himself and discovered a large cache of marijuana. Judge Aldisert held that the search was conducted by a private party whose airline job was to report suspicious parcels, in order to protect himself and his employer. The judge said there were no sufficient minimal contacts to show the employee's governmental agency.

 The Court concludes here that Hornblower made the search of the desks to protect itself. Under the securities laws, the firm can suffer administrative penalties and face extensive civil liabilities if its em-

---

1. Since the Court finds that the original search and seizure was without any outside influence or request, it does not here reach the question of whether the NASD is in effect an arm of the government or not. Once the search and seizure have been conducted and the articles removed from defendants' possession by private action, government possession and use does not contravene the Fourth Amendment. *Bur-*

*deau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1920); *United States v. Goldberg*, 330 F.2d 30 (3d Cir., 1964), *cert. den.* 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). Even assuming that for Fourth Amendment purposes, the NASD is "the government," their request for them and possession is not unconstitutional.

ployees have been engaged in wrong-doing due to lax supervision. When the possibility of illegalities by Cronin and Street became known to their employers, the supervisors took swift moves to find out the extent of the trouble and to protect the firm from any future liability. Since, as in *Burton*, no statute or regulation directly commanded Hornblower to perform the search and as in *Valen*, the searches protected the employer as well as aiding in law enforcement, the Court finds that the government did not influence these searches.[2]

Cronin and Street argue that the particularly heavy burden of self-policing imposed by securities regulation requires private employers to act in lieu of the government and therefore entitle persons to constitutional protection from their employers. This argument was clearly rejected by Judge Friendly in *United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975). In that case, Judge Friendly considered the question of whether statements coerced by the stock exchanges under threat of expulsion were protected by the Fifth Amendment. He held that since the stock exchange was not a public actor, it could not violate such constitutional rights. He acknowledged that many statutes require severe self-policing that may encourage employers to take drastic and coercive acts, which if performed by the government would be unconstitutional. However, he stated that it is necessary for proper economic regulation, and does not bring constitutional dimensions to regular employer actions. For example, he cited the Elkins Act, 49 U.S.C. § 41(2), which imposes criminal liability on a railroad employer for acts of its employees. Its purpose "was surely to enlist the aid of the carriers and shippers in policing their employees . . . [T]here would be a complete breakdown in the regulation of many areas of business if employers did not carry most of the load of keeping their employees in line . . ." 509 F.2d at 870. Judge Friendly held that a private actor, in accordance with controlling employees' illegal activities, may impose sanctions preventing exercise of Fifth Amendment rights. The Court feels that *Solomon's* rationale is equally applicable to this Fourth Amendment claim. The ability of a brokerage firm to regulate its own employees and to monitor their business activity cannot be unnecessarily hamstrung or that increased regulatory burden will be placed back on the government. The laws and regulations do not specify the means for accomplishing brokerage self-policing; they only require that it be done. Since Hornblower chose on its own to search for and seize the evidence in question, that was a purely non-governmental act. Therefore, the motion to suppress must be denied.

## Government Misconduct

Defendants Cronin and Street have argued that the indictment against them should be dismissed, or their SEC testimony suppressed, because of "government misconduct." Three portions of their argument will be considered here: 1) that the SEC violated their due process rights by the informal procedure of referral for prosecution; 2) that the SEC was misusing the civil proceeding to conceal a criminal investigation; and 3) that an SEC attorney intentionally led them to believe that they were safe from prosecution by telling a third party that they were not targets. The fourth claim, of use of illegally obtained evidence, has previously been discussed.

---

2. The Court believes that the mere existence of laws, which may continue being broken if private action is not taken, does not convert private action to government activity. Otherwise, there would be no private searches except by mistake. As in *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1974) where the nurse was so appalled by the Medicare abuse that she turned her employer in, private searches are conducted by individuals who suspect lawbreaking. Even since 1920, courts have consistently recognized the legitimacy of such public-spirited searches. Therefore, the fact that the desks of Cronin and Street were searched because they were suspected of violating federal laws or regulations does not mean that the Hornblower supervisor was transformed into a government agent for Fourth Amendment purposes. Instead, he was acting as a private citizen interested in proper obedience to the laws.

Regarding the use of the informal reference procedure, Judge Haight dealt with that issue in some detail in *United States v. Fields*, Cr. 76 Cr. 1022–CSH (S.D. N.Y., June 2, 1977). After reviewing that decision, and the SEC *amicus* brief presented to the court of appeals in *Fields'* appeal, the Court agrees with Judge Haight's reasoning and adopts it. The principle of informal reference does not in itself offend any constitutional guarantees. Cronin and Street have not demonstrated any way in which informal reference harmed them. The reference was made by Dennis Taylor, the primary SEC attorney investigating Magic Marker, in 1975. This date was long after Street and Cronin testified before the SEC and they consented to NASD sanctions. This is not a situation, such as *Fields*, where the criminal reference was concealed to mislead defendants into a civil settlement. Here, the SEC did not even undertake any civil action against Cronin and Street. Since the informal reference here did not work any demonstrable harm, the Court finds that it was not improper.

The two were investigated by the NASD and ultimately consented to a bar from practice by that organization. Because much of their argument of "government misconduct" involves the actions of the NASD officials, it is important in this section of the memorandum to decide whether or not the actions of the private self-regulatory group bind the government. Defendants argue that since the NASD's existence is allowed by statute, its rules are subject to SEC approval and its sanctions may be appealed to the SEC, it is in fact an arm of the government. If that were so, its procedures would be subject to constitutional strictures and its officials could bind the SEC and other government agencies. Two recent decisions have examined the NASD, its authority and history in some detail and are instructive here.

In *Lange v. H. Hentz & Co.*, 418 F.Supp. 1376 (N.D.Tex.1976), the court was presented with the question of whether the NASD rules could serve as a federal jurisdictional basis for an implied right of action—in effect, whether they were effectively federal regulations in the same sense as an SEC regulation would be. The court carefully examined the origins of the NASD as a part of "cooperative" regulation. The Court noted its statutory roots and its close association with and dependence on the SEC. "Yet despite owing its existence and in large measure its power and prestige to the SEC, NASD is still a private association governed by its own rules as developed and applied by its own members." 418 F.Supp. at 1379. The court concluded that although the rules would not support an implied right of action in themselves, they established a standard of care for the industry by which broker-dealers could be evaluated. This holding recognized the NASD as the professional association that is seeking to promote high standards and maintain a good reputation for the trade, no different from other trade or professional groups.

This description of the NASD is borne out by the evidence on the record here. The NASD is a national association, whose members comprise the great bulk of the brokerage firms in the country. It is funded solely by its members and its rules are made by the members. It is only controlled by the securities industry, as one witness testified. It conducts independent investigations, and monitors many actions by the firms, such as personnel terminations, of which the SEC is unaware. When its investigation reveals something egregious, this information is passed on to the SEC.

Judge Friendly, in *United States v. Solomon, supra*, considered the question of the status of self-regulatory groups in a criminal context. There, he considered the New York Stock Exchange, but his arguments have equal force here. As Frederick Englert, house counsel for Hornblower, recognized, the exchanges and the NASD are similar groups, all involving in self-policing but having back-up authority in the SEC. One of the primary reasons that Judge Friendly held that the exchange was not a government actor was the problem of immunity.

[To hold that the exchange was governmental] would mean that a large number of private bodies have been unwittingly endowed with a power to grant exactly such immunity . . . without any weighing of the need for evidence against the desirability of conferring an immunity which goes beyond the testimony or information itself, and without the supervision of the Attorney General to which even government agencies are subjected. 509 F.2d at 870.

Furthermore, as Judge Friendly noted, if the securities self-regulating bodies were to be deemed "governmental," it would be difficult to draw the line.[3] As he says, *supra* at 869: "[T]his is but one of the many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal statutes."

 The Court must conclude that the NASD is not part of the government and its actions cannot be imputed to it nor its agents to bind it. To hold otherwise would be to eliminate a bulwark of our economic regulatory scheme, for there would be no need for a NASD if it were in effect a lower level of the SEC. Although private, it plays an important role in the scheme of securities regulation. It allows the securities industry to keep its own house clean and holds back the seemingly overwhelming tide of government supervision. Therefore, the Court will not consider the acts of NASD officials or their comments to be imputed to the SEC.

 Cronin and Street's second argument, that the SEC was using its civil investigation as a ruse to gather evidence for criminal prosecution, must fail when the facts are examined. Of course, there is no inherent unfairness in a system, such as securities regulation, which allows pursuit of both civil and criminal remedies. *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). Where the same events might be either civil or criminal, "a rational

decision whether to proceed criminally . . . may have to await consideration of a fuller record. . . . It would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief or to defer civil proceedings pending the ultimate outcome of a criminal trial." *Kordel* at 11, 90 S.Ct. at 769. Of course, the possibility of unfairness exists when the civil and criminal proceedings are commingled. *United States v. Fields, supra.* In tax cases, a summons may be defeated if it can be shown that it really is for criminal investigatory purposes. However, as Chief Judge Seitz noted in *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975), the mere fact of an investigation is not enough to show use for criminal purposes. Instead, it must be shown that the summons is issued in bad faith. Quoting *United States v. Wall Corp.*, 154 U.S.App.D.C. 309, 475 F.2d 893 (1972), the Chief Judge set up a test to discern the true nature of an investigation:

"[I]f it can be shown that the investigating agent had already formed in his mind a firm purpose to recommend criminal prosecution even though he has not as yet made a formal recommendation, issuance of the subpoena would presumably be in bad faith. Similarly, if the civil liability were already determined, the summons would appear to be solely for a criminal purpose." 514 F.2d at 374.

In *McCarthy*, the Court of Appeals concluded that there was no bad faith, since the Internal Revenue Service had not pursued all civil sanctions at its disposal in the case. The burden of showing improper use of the investigation is on the defendants. *United States v. Fisher*, 500 F.2d 683 (5th Cir. 1974).

The Court concludes that the *McCarthy* test is equally applicable here. Dennis Taylor, the SEC attorney whose state of mind is most pertinent as the primary investigator, testified that although he was continu-

---

3. It is lack of consideration of these full constitutional ramifications that has caused this Court to reject defendants' authority, *Harwell*

*v. Growth Programs, Inc.*, 315 F.Supp. 1184 (D.C.), *reversed on other grounds*, 451 F.2d 240 (5th Cir. 1971).

ally sifting the evidence and allegations throughout the investigation, it was not until the fall of 1974 that he made serious attempts on his own and with supervisors to decide on what basis the case would proceed. It was agreed that he would go on a trip and interview a few key individuals, notably Jack Silbiger, and based on the fruits of that trip, it would be decided. Upon his return, discussions were initiated with the Justice Department—the first appointment being in December, 1974—and final referral was made in January, 1975.

This means that when Cronin and Street testified in the spring and summer of 1974, the investigation was still civil. They argue however, that based on the probable cause facts that already were being turned up early in the investigation, that it was clearly criminal almost from its very inception. They contend that the test should not look to when the investigator actually decided to refer, but rather, when he should have decided to refer, based on probable cause. This allows the Court the luxury of hindsight's wisdom, which is unfair to the prosecutor. Many of the probable cause facts put forward by defendant were not known by the SEC, but were only revealed to the NASD. Therefore, it cannot be assumed that Taylor knew them. For example, one NASD official, James Dawson, had been told by an informer that Cronin and Street bragged of manipulating Magic Marker. This he told Frederick Englert, but did not tell the SEC. Almost all of the documentary evidence compiled by the NASD was not requested by the SEC; only the Cronin check stubs and the formal complaint were turned over. The Court cannot presume that any greater volume of facts than this were communicated orally. Similarly, other so-called "facts" were not being corroborated. Taylor was told that Cronin and Street had a close relationship with the Magic Marker exchange specialist. Yet the specialist, in his proffer, never mentioned them. Seeing that early in the investigation, which only was begun by Taylor in January of 1974, there were many unproven allegations and little corroboration, the Court finds it credible that he did not decide until much later to refer the investigation criminally. It should be noted also that many of the points defendants propound as relevant are incidents involving other persons. Taylor really had very little evidence prior to the summer on Cronin and Street that would make them likely candidates for indictment. The Court does not find that the SEC had firmly decided to refer the cases of Cronin and Street for indictment, or the Magic Marker case as a whole, until the fall of 1974.

■ As further evidence of Taylor's good faith in using the civil investigative system, the Court notes that none of the SEC's civil sanctions had been used against Cronin and Street. As was explicitly stated in the NASD consent both men signed, the private bar does not prevent any action by the SEC. Therefore, under the *McCarthy* good faith test, it is clear that the civil procedure was not being misused.

■ Defendants claim that they were intentionally misled by statements allegedly made by Taylor to the effect that acceptance of a NASD bar would mean the end of the SEC's pursuit of them. This comment was made allegedly to Englert, but was not recalled by Taylor. The Court, having difficulty in deciding issues of credibility among lawyers, has concluded that Englert's testimony is not reliable. The Court finds that in much of his testimony, he inferred facts much beyond what they actually were. The Court notes that he is presently house counsel for Hornblower, a firm which may suffer extensively if Cronin and Street are found guilty. He testified, for example, that the SEC knew of the NASD's talk with the informer; the NASD official denied this. Englert said that the NASD officials told him that they were handling the Cronin and Street investigation on behalf of the SEC; these remarks are also denied. Basically, it appears that Englert's memory incorporates his own beliefs and assumptions in such a way that somewhat distorts the facts. Therefore, the Court finds that Taylor did not make any representations as to his investigation, his desire

for Street's testimony or any other fact, designed to induce testimony under false pretenses.

Cronin and Street erred in two ways: 1) placing too much stock in Englert's assurances, when he was not their lawyer, but a representative of Hornblower; 2) not heeding counsel's advice to claim their Fifth Amendment rights. Both were so carried away with their desire to end their troubles, and so taken with Englert's promises that they were almost in the clear, that they perhaps ran headlong into the indictment. Both attempted at the hearing to portray themselves as innocents, drawn in by the friendly attitude of Taylor. Cronin, especially, seems to remember things as he wishes they had been. He testified that he was relying on Englert's statements when he consented to the bar, but he signed the consent in February, 1974 and the Englert conversation was not until April. Both were sophisticated broker-dealers, knowledgeable in securities regulations. Both were represented by counsel and knew, or should have known, of the reality of possible criminal prosecution. In *United States v. Light*, 394 F.2d 908, 914 (2d Cir. 1968), that court held that when parties voluntarily turn over books and records to the SEC in a civil investigation, those were valid evidence in a criminal trial. "(T)he government is not guilty of fraud or deceit in failing to apprise the subject of a [later] change in the character of the investigation, *for he is made aware of the risks attendant upon a voluntary disclosure by the warning* inherent in the request." (Emphasis added). Here, where the defendants were fully warned and were represented by counsel at all sessions, the Court feels that they must abide by their voluntary testimony. The Court does not find any government misrepresentations, and no statements made which falsely induced or compelled their testimony.

The defendants have made broad-ranging claims of government misconduct, and have asked to have the indictment dismissed. After carefully reviewing the testimony, the Court finds that no misconduct occurred. The reference procedure, though informal, did not infringe upon any rights; the SEC did not induce civil testimony while hiding a concurrent criminal investigation; and the government attorney made no misrepresentation or promises to mislead defendants. The motion to dismiss or suppress is denied.

*Immunity*

Defendant Salaman has argued that he should be considered immunized because the SEC informally agreed not to prosecute him. In the alternative, he contends that a civil settlement immunizes his informal testimony to the SEC, because it is incorporated in that agreement by reference.

Salaman's claim of informal immunity turns on the facts. The context and meaning of any statements made is a factual question which must be resolved by the Court, before it can reach the ultimate legal issue of whether they comprise a grant of immunity. The findings of the Court on facts underlying a claim of immunity, including resolution of credibility issues, will not be disturbed on appeal unless clearly erroneous. *United States v. Kelly*, 556 F.2d 257 (5th Cir. 1977).

In July, 1973, Arthur Mathews was retained to represent Salaman, who had previously been represented by Steven Goodman. It was felt that Goodman might have a conflict representing both Salaman and Delphi Capital, a brokerage firm of which Salaman was president. At that time Salaman was officially under investigation regarding eight stocks, not including Magic Marker, the subject of this indictment. Mathews was a partner in a prestigious Washington firm and specialized in securities work, having been highly placed in the SEC staff at one time. When he took over, Mathews immediately undertook to promote a civil settlement. Mathews advised his client to cooperate, by testifying both formally and informally. He also, however, reminded him of his Fifth Amendment rights, told him that the SEC could not compel his testimony, and apprised him that the SEC would not grant formal immunity.

On August 29, 1973, after Salaman had testified on two occasions,[4] a meeting was held to discuss Mathews' proposed settlement. Present were William Schief, Taylor and a third SEC staff member, and Goodman and Mathews. It was at this meeting that Goodman became convinced that the SEC would not prosecute unless the settlement was rejected because of new incriminating information or false testimony by Salaman. Schief made a statement that if Salaman accepted a bar, his problems with the SEC would be resolved and he could make a "fresh start." Schief was never asked at the hearing what he meant by this statement, but Taylor put it into context. Taylor stated that Mathews had previously told the meeting that he had discussed Magic Marker stock with Salaman, and was assured that he had no criminal exposure there. Therefore, he volunteered Salaman's informal testimony on that stock. Schief's statement as to the "fresh start," Taylor testified, was premised on this representation by Mathews of Salaman's innocence with regard to Magic Marker. It is clear to the Court that Schief was not immunizing Salaman with regard to wrong-doings he knew nothing about at that time, such as his role in alleged Magic Marker manipulation. He was merely saying that based on his evaluation of Salaman's illegal activity under investigation at that time, and Mathews' representation that there was no further illegal activity to be uncovered, the SEC would be satisfied with a bar. If Mathews was correct, Schief was saying, and Salaman had no criminal exposure regarding Magic Marker, then the SEC would stop with the bar, pursuing him no longer, and he could have a "fresh start." This certainly does not constitute an agreement not to prosecute on Magic Marker.

Mathews clearly understood that the SEC was not promising to refrain from any prosecution. At least twice in his testimony, he told the Court that there were never any promises made to him or his client that Salaman would not be indicted "in Magic Marker or in any other case." N.T. at 23,

see also 47. In fact, it was clear to Mathews that Magic Marker activities were not even covered by the settlement offer. However, Goodman, who was informally continuing to counsel Salaman, believed otherwise. He testified that based on the "background of discussions," most notably the August 29 meeting which was the only one he personally attended, and information that Mathews had given him regarding ordinary SEC practice, it was his "understanding" that there would be no prosecution on any stock Salaman testified about, unless it was found that Salaman had given false information or if new very incriminating evidence was found. N.T. at 2–9. Goodman informed Salaman of Schief's "fresh start" comment, but apparently took it out of context to imply that the SEC would not pursue any information that it might uncover with regard to other stocks if Salaman took the bar. What should have been apparent to Goodman was not; that is, that the discovery of Magic Marker manipulation, with significant evidence incriminating Salaman, was exactly the type of discovery that would end Salaman's "conditional immunity," if there had ever been any immunity at all. Therefore, even based on Goodman's distortion of the Schief remark, he should have been aware that prosecution was still a very real possibility for Magic Marker activity. .

■ Goodman was mistakenly under the impression that once the settlement was approved, the SEC would not continue to investigate those stocks not covered by it. There is no language in the settlement, as Goodman recognized in his testimony, that in any respect immunizes Salaman from this criminal prosecution. In fact, the settlement specifically reserves, at the insistence of the SEC, the right to bring criminal actions even as to those stocks which it covers. The Court does not find any basis for believing that any statement by a SEC official constituted a grant of informal immunity or that acceptance of the settlement precluded criminal action on Magic Marker or any other stock. Since the Court does

4. Salaman testified, either on or off the record, on August 15, 28, September 20, 21, 1973.

not find that any promise was made or could be inferred, there is nothing upon which to base any implied immunity, *United States v. Ellison*, 557 F.2d 128 (7th Cir. 1977).

Furthermore, there is no credible evidence upon which the Court could decide that Salaman thought he was immunized. Salaman was never told by any government official that he would not be prosecuted regarding Magic Marker. Mathews told him that he could be prosecuted even if he cooperated. Even Goodman counseled him that, if there were new developments, he could be prosecuted. These lawyers were not ignorant lay persons, as in *Matter of Doe*, 410 F.Supp. 1163 (E.D.Mich.1976) but were legal technicians. Surely they could be expected to distinguish between a grant of immunity and an off-hand comment based on incomplete information. This was recognized by Judge Haight in *United States v. Fields*, 76 Cr. 1022–CSH (S.D.N.Y. June 2, 1977) (Slip O. at 32). In that stock manipulation case, Judge Haight noted that lawyers cannot sit by and assume that civil settlement will bar criminal prosecution, nor can they assume that the SEC's silence on this issue of criminal action alone means that immunity has been granted.

> "Experienced defense counsel are, perforce, aware that in cases of this nature, 'more than civil proceeding might be contemplated,' . . . In these circumstances, if they wish to condition their client's participation or cooperation in a civil proceeding, conducted by the SEC, upon an agreement by the SEC not to make a criminal reference, it is the obligation of counsel to make that specific request, and then be guided by the SEC's response to it. . . . In the Court's opinion, the burden of requesting and obtaining an express agreement from the SEC, in cases of this nature, falls reasonably upon the shoulders of defense counsel; and it follows that defense counsel cannot reasonably equate silence on the part of the SEC with assent." Slip O. at 32.

Goodman testified at trial that he was "very concerned" about the possibility of criminal reference. At no time did he express this concern to the SEC, as did the attorneys in *Fields*. He never made any statement to the SEC regarding his "understanding." Furthermore, no formal steps were taken by either attorney toward formal immunity, such as submitting a proffer. It appears that Goodman was willing, even with his apparently greater knowledge of Salaman's "exposure" than Mathews had, to take a chance and hope that prosecution never occurred.

Furthermore, there is no credible basis for finding that Salaman believed himself immune from prosecution. In *United States v. Kelly, supra,* the appellate court noted a number of facts supporting a district court's conclusion that the defendant could not have believed that he was immunized. Among those factors, also present here, were the frequent reminders of his right to avoid self-incrimination and the fact that the interviews were all prefaced with full warnings. As in *Kelly,* the Court finds no basis for believing that Salaman's immunity was anything more than wishful thinking on his part. At each session, both on and off the record, he was given full warnings. His personal attorney reminded him of his Fifth Amendment rights. At the hearing, Salaman discounted all this. His testimony in essence was that although he had been warned, and although he signed the settlement which stated that he could still be prosecuted, those facts did not really count. He contended that he relied on Mathews' excellent reputation and personal SEC contacts to avoid prosecution. Although repeatedly warned, Salaman refused to see the seriousness of his position. Instead he looked to Mathews to "arrange" it for him. He claims that he followed every word that Mathews said, but apparently he forgot the reminder of his right to remain silent. He seemed more guided by Goodman, and his lulling assurance of the improbability of prosecution. Goodman in fact had close ties to Magic Marker, having been a director and corporate secretary, in addition to serving as general counsel. It is unfortunate that Salaman did not know,

and Goodman did not warn him, of the threat that lay in Magic Marker testimony.

Salaman argues that even if he is not immune from prosecution, his informal testimony should be suppressed since it is incorporated in and protected by the settlement. At the hearing, Salaman pointed to a paragraph in the settlement which states in part: "(N)one of the statements contained herein constituted an admission by . . . Salaman . . . that can be used in any civil, criminal or administrative or other proceeding or action. . . ." Salaman testified that he interpreted that language as meaning that his testimony given during the negotiations was incorporated into this document and could therefore not be used against him. He also testified that this interpretation was supported by Mathews. The Court finds this testimony incredible, and the legal conclusions underlying it erroneous.

 The language referred to by Salaman is clearly applicable only to those statements printed on the face of the document. This type of disclaimer is used often and is important in settlements, since there has to be some factual underpinning outlined to allow a party to benefit from a settlement for res judicata purposes. However, this language avoids the possibility of treating the settlement as an admission of wrong-doing, so that civil liability may not be premised upon it. It does not pertain to any statements outside the decree itself.

Furthermore, although both Goodman and Epstein opined that the testimony was an integral part of the settlement, this Court does not agree. Much of it was given prior to any serious negotiations. There is no way that the Court, or any responsible attorney, could believe that the testimony is immunized by this paragraph. The Court does not believe that Mathews so advised his client. The motion to suppress must be denied.

*Fifth Amendment*

Defendant Salaman has also moved to have his statements to the SEC suppressed, and to dismiss the indictment, because of violations of his Fifth Amendment rights. Specifically he argues that use of these statements would constitute testimony against himself in a way violative of the Fifth Amendment. Furthermore, he contends that the statements were not given voluntarily, but were coerced by the pressures of the civil settlement process.

Defendant's first argument is premised on the good intentions of Mathews, Salaman's attorney at the time. Defendant argues that Mathews sought in the settlement negotiations to protect his client's Fifth Amendment rights and the fact that the settlement offer on its face did not do this regarding informal testimony should not prejudice him now.

The Court finds that on the facts of the case, as well as the law, this argument must fail. Mathews was concerned with the SEC's demand that his client waive all Fifth Amendment rights for testimony in future proceedings. He was concerned that at some future time, Salaman might be a respondent or defendant and be required to incriminate himself from the witness stand. Initially, the SEC wanted an *in futuro* waiver of all Fifth Amendment rights. The language of the final settlement reflects how Mathews acted upon his concern:

> "In regard to the giving of testimony against others in proceedings in which they are not named as defendants or respondents, DELPHI, SALAMAN, and KAYE waive any applicable attorney-client or Fifth Amendment privileges with respect to the matters encompassed by the Order for Proceedings to be entered and the consent injunction decree. . . . With the exception of all representations, undertakings, commitments, and waivers herein, SALAMAN and KAYE reserve the right to claim any applicable legal or constitutional right or privilege including their right to refuse to testify further with respect to any future proceeding brought against either or all of them."

It is clear that Mathews ably bargained the SEC down from its across-the-board Fifth

Amendment waiver for future proceedings. Under this settlement, Salaman agreed only to testify if he were not a party and only with regard to the eight stocks under the Order of Investigation, which did not include Magic Marker.

Mathews noted at the hearing that, upon Taylor's insistence, the settlement allowed the SEC to use the formal testimony for any purpose whatsoever. Schief testified that the SEC would never have accepted any testimony that had conditions as to its use. The settlement is silent with regard to the use of the informal testimony, in which Salaman discussed Magic Marker. Mathews admitted that this question was never specifically addressed by either side: "(A)s I review my files and those drafts [of the Offer of Settlement] there was never any consideration given or any request made that I can recall of what could or couldn't be done with any informal testimony." N.T. at 24. Furthermore, any claim of rights in the settlement operated only *in futuro*, since "they had testified both formally and informally without claiming their Fifth Amendments right [prior to final settlement]." N.T. at 51.

The Court cannot find from any of the testimony that Mathews, as counsel for Salaman and drafter of the settlement, intended to prevent the informal testimony from being used against his client. To be sure, he may wish now that he had foreseen this possibility, but he candidly admits that at the time, he did not consider this. During the negotiations, he was most concerned with future testimony regarding the eight stocks, and he successfully protected his client's Fifth Amendment rights in that area. His legal efforts however do not reach the informal Magic Marker testimony in any way.

■ Defendant seems to argue that the statement claiming Fifth Amendment rights can operate retroactively and that, although he failed to remain silent at the time of his testimony, his later statement retaining all rights covers his prior interrogation. He could only now claim rights given up previously if he had been coerced, an argument which is discussed below. Otherwise, they have been waived. *United States v. Rubinson*, 543 F.2d 951 (2d Cir. 1976). The Court can find no case law to support this argument absent duress. Once, as here, rights are knowingly and intelligently forfeited, with full warnings and counsel in attendance, a later change of heart will not alter that or serve as a basis for suppression. In *United States v. Kordel, supra* 397 U.S. at 9, 90 S.Ct. at 768, the Supreme Court said that the defendant's failure to claim Fifth Amendment rights in a civil setting that also resulted in a criminal trial, "leaves him in no position to complain now that he was compelled to give testimony against himself." The mere fact of prior civil proceedings does not constitute an excuse so that a defendant may take back his words. *United States v. Rubinson, supra.*

■ Defendant argues that "in the purest sense" use of the statements would constitute prohibited self-incrimination. The Fifth Amendment is not an absolute bar to self-incrimination; it merely prohibits the government from compelling such testimony. If a defendant, for any reasons, wants to testify and thus incriminates himself, it will not be suppressed unless coercion can be found.

Defendant contends that the threat of disapproval of the settlement was coercion in the constitutional sense. He bases this argument on a line of Supreme Court cases, from *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) to *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). These cases hold, as the Court said in *Cunningham*, at 806, 97 S.Ct. at 2137: "[G]overnment cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized." Defendant argues that since the informal testimony pertaining to Magic Marker was a condition precedent to acceptance of his Offer of Settlement by the SEC, withholding or denial of the settlement was a "sanction" which forced him to incriminate himself.

■ The Court finds that the disapproval of civil settlement is not a "sanction" under the *Garrity-Cunningham* cases. There are three factors which contribute to this conclusion: 1) the "sanction" did not involve taking away a right but was merely not granting a gratuitous benefit; 2) the "sanction" did not explicitly flow from the exercise of the Fifth Amendment; and 3) the "sanction" was not of the degree to work a constitutional deprivation.

Salaman was seeking settlement of extensive civil proceedings against him. He had no right to settle; the SEC, although reluctant, had decided to try to negotiate so as to resolve it quickly and in a least painful manner for Salaman's benefit. In *Cunningham*, a New York statute required removal from political party office if an official refused to testify. The Court there held in part that such removal was a "sanction" because it required forfeiture of one constitutional right, free political exercise and association, for another. In *Garrity* and the cases flowing from it, public employees were required to sacrifice their government jobs, which are semi-constitutional rights, in order to claim their Fifth Amendment privilege. Defendant has not, and the Court concludes cannot, cite any law that elevates a defendant's desire to settle to the level of a "right." Therefore, even viewing the withholding of settlement as a deprivation, it does not mean that defendant lost anything he was legally entitled to, but only something that he wanted to have. As the court noted in *Flint v. Mullen*, 499 F.2d 100, 104 (1st Cir. 1974), "[N]ot every undesirable consequence which may follow from the exercise of the privilege against self-incrimination can be characterized as a penalty."

Also, this is a situation where the question is whether the glass is half-full or half-empty; it all depends on how it is viewed. Rather than viewing the withholding of settlement as a deprivation, the Court could view the granting of settlement as a reward or benefit. Surely, a reward for testifying cannot be termed a "sanction," since it is not obligatory to claim a reward. Nothing really is being taken away from defendant by disapproving a settlement, for he is legally no worse off than he was before. His choice, therefore, is not as in *Garrity*, "the antithesis of free choice." 385 U.S. at 498, 87 S.Ct. 616. At any point, Salaman could have claimed his Fifth Amendment rights and proceeded to trial.[5] Voluntary cooperation carries with it its own risks, and Salaman certainly had reasons to be aware of them, as the Court discussed with regard to his immunity claim. *United States v. Light, supra.* In *United States ex rel. Sanney v. Montanye,* 500 F.2d 411 (2d Cir. 1974) the court felt that the defendant was relieved to make his confession after hiding his guilt. Where the defendant benefits from the confession, the court said, his will has not been overcome despite alleged coercion.

Unlike as in *Garrity, Cunningham, et. al.,* there was no *quid pro quo* here that required Salaman to choose between settlement and his constitutional rights. In *Cunningham* and *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), the statutes presented an "either-or" choice: either testify or be fired. Here, there was no such tradeoff. There was no certainty that testifying would produce a settlement, and although Salaman's attorneys believed that any failure to cooperate would forfeit settlement, the SEC never presented this as an express condition. Since there were other factors which might have influenced whether or not settlement was approved, any "sanction" could not necessarily be found had flown from any assertion of privilege. Judge Friendly, in *Solomon,* supported this interpretation. He said that *Garrity* cases held that coercion existed "when the invocation of the privilege was clogged with *certain* forfeiture of office and pension rights and permanent disability from state

---

5. Except for litigation costs, Salaman might not have suffered any greater had he chosen not to settle. At present, he is barred from the securities industry, which is the SEC's ultimate civil sanction. His chances for reinstatement, according to Dennis Taylor, are virtually non-existent.

employment." (Emphasis in original). 509 F.2d at 867. He distinguished the case before him, in which a refusal to testify before the stock exchange might mean suspension, because the exchange rules allowed great latitude in disciplining. He said that it was possible that no suspension, or at least a minimal one, might be imposed.

Finally, the Court finds that the alleged "sanction" is not severe enough to coerce a defendant to trade off his constitutional rights. In the *Sanney* case, 500 F.2d at 415, the appellate court held:

> "A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected only when the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer.' *Garrity, supra.* . . It must amount to a choice 'between the rock and the whirlpool.' "

Here, it was apparent that the settlement would yield no significantly lesser penalty. The burden that would be placed on defendant by rejection of the settlement, was litigation costs, which might well have been significant. However, these costs would not eliminate his ability to earn a living, as in *Garrity, Turley* and other Supreme Court cases. The bar was inevitable whether he testified or not. Therefore, the Court does not find that the repercussions of not testifying would have been so great as to require him to trade off his Fifth Amendment rights.

Since defendant's Fifth Amendment rights were never claimed, and no coercion can be shown under the *Garrity* cases, the motions to suppress and dismiss must be denied.

### Appointed Counsel

Defendants Myron Freeman and Jack Silbiger have moved this Court to suppress testimony on the grounds that when they appeared before the SEC, they were financially unable to retain counsel. Neither defendant has been able to cite any law to support this extension of the right to appointed counsel in a civil administrative setting. In light of the authority stating that there is no right to appointed counsel in these circumstances, *Boruski v. SEC*, 340 F.2d 991 (2d Cir.), *cert. den.* 381 U.S. 943, 85 S.Ct. 1780, 14 L.Ed.2d 706 (1965); *Feeney v. SEC*, 564 F.2d 260 (8th Cir. 1977), the Court will not extend the law so far.